We'll hear the first case on calendar, J.C. v. Katonah-Lewisboro School District. Thank you. May it please the court, James Drohan for the appellant. If I may launch directly into the deference issue. As this court is aware, the posture in which the case comes to the court is that the district court was considering the same record as was before the state review officer, which is a factor that militates in favor of deference. He was also considering the court was an issue which is substantive rather than procedural under Rowley and the Supreme Court's March 22nd decision in Andrew F. And this was an issue where we had asked the court to defer to the state review officer, which generally speaking, unless that decision is not sufficiently reasoned, is what under the teaching of this court is the decision which is more appropriate to acknowledge all these and acknowledge that with an issue of class size, which is how the district court described the narrow issue boiling down to, that this is an issue of educational policy on which deference again would be appropriate. And finally, in choosing... It doesn't boil down to the question of whether we give greater deference to the IHO or to the SRO? Yes. The reasoning for the IHO's deference was that he had, or she, had considered the issues quite fully about class size and why the class size was a problem in the IEP, right? Yes, and if I may address that... That's what the case seems to boil down to, this class size issue, primarily. Primarily. And the discussion, and it's at pages 404 and 405 of the appendix, it's approximately three paragraphs. And what it appears the IHO did is he made a fundamental misreading of the report that he was relying upon to draw his conclusion about an appropriate class size. He started out by saying that the prototype, according to Dr. Dorda's report, and this is at 8-1-1 class, which of course, as the SRO mentioned, was the same teacher-to-student ratio as a 12-1-2. Then the... If you add up the teacher-to-student, yes, but on the other hand, if you've got 12 students and one teacher and two assistants, it's different than 4-1 or 8-2 because you have a different number of assistants. In other words, the one-on-one professional of the teacher is different. It's a smaller class. And also, one of the issues here was how maybe a person with the same ratio does better in an 8-1-1 as opposed to a 12-3 because of the size number of students involved. Yes, and on that issue, and what the IHO went on to say was, and what he really hinged his decision on was that he read Dr. Dorda's report as requiring one-to-one instruction in the core academic subjects throughout the school day, and this is on pages 404 and 405. That's actually, frankly, a misreading of Dr. Dorda's report. What Dr. Dorda actually said was that with regard to small instruction, he said at the discrete academic intervention level, and it's clear from his report at 404, 405, that he's talking about small group instruction, ideally of no more than three students, only for reading fluency and reading decoding and not for the core academic subjects throughout the day. That was a frank error by the IHO, which was adopted by the district court. Is it reading a core academic subject? I beg your pardon? Is it reading a core academic subject? Yes, but what the IHO said was that it was required in all the core academic subjects throughout the school day, rather than for reading fluency and reading decoding, which is what the IHO was speaking to, and that misinterpretation was then adopted by the district court, who said that the special education teacher in the district's proposed 12-1-2 class could not provide that one-to-one instruction in the core academic subjects throughout the school day. It does look like the SRO was focused on the numbers, on the ratio, rather than the impact of a crowded classroom on this particular student. I don't know that he mentioned that. If you're just dealing with the numbers, you might as well have 24-2-4 ratio, only you'll have a big classroom and a child that's easily distracted because of deficits would just be at sea and learn nothing. That was not the only thing Judge Jacobs that he hung his hat on, basically. He also said, you know, six of one, half a dozen of the other. And he also said- Judge Harris also said that the SRO really didn't focus on the parents' placement, just didn't engage with that issue. With the parents' placement, Judge Parker? Yeah. Well, he wouldn't have because he didn't reach prong two, right? So there's no reason for him to go to prong two. Forget that part. Yeah, exactly. Just go- Let me ask you this. Sure. What is the standard now for judging these cases? Under Andrew F., what the Supreme Court has said, as we read it, Your Honor, is that the I- Two weeks ago, they decided this case. Yes, right. And of course, there isn't a whole lot that's come down to- Altered the standard, right? I think they said that they were following Rowley, but they were not changing it. They said Rowley only involved the narrow issue that was decided there- It had been interpreted before as the standard has some educational benefit or merely more than de minimis, and that was the Tenth Circuit, and we're close to that. And I think your cases have also talked about- That's changed. Yes. The thing that they've added is said that it has to be calculated to provide some educational benefit appropriate in light of the student's circumstances. Right. And it's got, in the other language they use, is meaningful. Yes. Meaningful, and also a chance to meet challenging objectives. And if I may speak to that, at the oral argument in the Andrew F. case back in January, Judge Roberts asked, well, how do we measure progress for a student who is not going to make progress grade to grade, which is acknowledged in this case, the student's what's called an alternate assessment student, which means by definition, he will never be able to track grade level goals. So he's never going to match up with the other students. But you do look at a trend, sort of like the stock market in a way, up and down, but hopefully a trend that moves up. Right. And the trend is measured, though not through state tests, but through the goals and objectives. They're called goals and short-term objectives for alternate assessment student. This actually came up in the oral argument in Andrew F., that this is the criteria that the IDA suggests, that you can't look at the state test for such a student, but for the progress on the goals and objectives. And in this case, in the 9-10 and 10-11 school years, which were the last two school years the student was in the district, he, in fact, had made progress. He had either achieved or was progressing satisfactorily in the majority of his goals. Even before he went to the school. That's right. So there's a history there. And let me ask you this. The Supreme Court, and they wouldn't have taken the case if they didn't want to change the standard, and they did change the standard. We're not sure exactly how to interpret that. But this was decided under the previous standard. And my question is, when cases are sub judice-y like this, and the standard has been changed by the Supreme Court that governs the determination, what do we do? The issue wasn't raised here specifically because the standard was accepted as the law of our circuit. But now we have a different standard. Shouldn't this case be remanded for reconsideration? In the event that you were to even prevail, wouldn't we want to send it back? Obviously, the court can do that. And that's one option. The other option is, since the court reviews the matter de novo, is it really necessary to remand it? It's not necessary to remand it if we rule against you. Because under the lower standard, it was found that he wasn't getting a fate. So that would be a fortiori the entire standard. But if we were to rule in your favor, then that would raise the issue, it seems. That's just the way to do it. But if I could point out, Judge Walker, that the SRO's decision, I think, dovetails with Andrew F. In getting to her discussion of the appropriateness of the placement, she starts off by saying, let me go through all the evaluations about the student, because they really inform the issue of the appropriateness of the placement. Which is in line, I think, with Andrew F.'s teaching, that it has to be reasonably calculated to make some meaningful educational progress in light of the child's circumstances. Your position is, if we accepted the SRO's analysis, went with that, and deferred to it, that that analysis satisfies Andrew F.? I would think it would, Your Honor, because she actually concentrated on the child's circumstances. And this, as all reviewers have said, this child has an immensely complicated picture. Judge Karras focused on one issue, attention, which was not even the most significant, anywhere near the most significant disorder. But without attention, you can't learn anything. True. But it was not the, according to Dr. Dorda, who was the neurologist, or neuropsychologist, excuse me, Judge Jacobson, whom the IHO relied on most heavily, the student had hypotonia, which is low muscle tone. That's why he had to have occupational physical therapy. That affected his ability to attend in class. He had fatigue. That's why he had physical therapy, because that lessens his availability for instruction. He had oral motor apraxia, which means he couldn't process speaking. He had a language processing disorder. And looking at the totality of the circumstances, and not just attention and to decide what's important and what's not. On the other hand, the IHO is the one who heard the testimony. That's right. But there weren't any issues of credibility here, Your Honor. I don't think any issues of credibility. In fact, there's no issue about the procedures of the IEP, nothing about it. What does Andrew F. change about our standard? Andrew F. rejected the standard of another circuit, that all that's required for the school district is to achieve de minimis progress. I'm not aware that ever was. That's correct. I'm unaware that ever was the standard here. And it wasn't applied by the IHO, the SRO, or the district court. I think I would argue that it's implicit, and it's always been implicit, that you have to look at progress in light of the child's circumstances. Here, the goals and objectives were not disputed as being as appropriate. I think that's been our law. I'm not sure. I believe that's . . . You can do this. I believe that's correct, Judge Jacobs. And that's certainly what we've always argued. And here, the goals and objectives are agreed upon. They changed the standard. They didn't come up with a brand new standard. But what they did was they said that the courts have been basically, and I don't know whether we would qualify, I agree with Judge Jacobs on that, have been too sort of narrow in our looking at the standard, rather than otherwise why even have the act. That was essentially their position, I think. And, you know, I don't know. We formulate our standard in slightly different language. Yes. But I'm not quite sure maybe, you know, where we . . . how that will play out under Andrew F. Yet. But in this case, just as Rowley was a student who was at the upper edge of the spectrum, she was doing better than most kids, and certainly age-appropriate goals and grade-level standards were appropriate for her. This is a student who's an alternate assessment student. That's like the one or two percent at the lower end who, by definition, can't get a Regent's Diploma, can't achieve a grade level. And . . . At least from our perspective, it's dangerous business when we start trying to distinguish Supreme Court cases that set standards on the basis of their facts. But sometimes we do it, you know. But I don't know whether we should in this case. And what I would urge is that since the goals and objectives are really what drive whether it's appropriate in light of the child's circumstances for a student who's an alternate assessment student, because that's really what determines what's appropriate. And there were goals here. There are 25 goals. They change from year to year. One year there was 36. One year there was 47. The years at issue, there were 25. And they had to do with decoding, reading fluency, attention. The student had made progress attending to task in prior years. Had to do with increased stamina and ability to attend. And no one is disputing on the posture that this comes to this court that these goals and objectives were appropriate. That being the case, I think it's impossible to say that under the Supreme Court standard that this wasn't appropriate progress in light of the circumstances. So go back to the narrow issue of the placement. You've reserved a couple minutes for rebuttal. I did. We'll hear you then, sir. Thank you, Judge. Good morning, Your Honors. Lawrence Weinberg for the parents. One of the issues that came up in oral argument was goals. And counsel for the district said that the goals were different from year to year. In this case, the goals changed in earlier years, but in the IEP at issue, the goals did not change and were held over. And so I think that if the parents did not prevail, and I think they would prevail on both the substantive issue that there was proper deference to the IHO, and also they would prevail on the procedural issue of predetermination. But if the parents did not, I think that there would need to be a remand on the issue of whether under Andrew F, it's appropriate for a school district to ever repeat the goals for a student. And because Andrew F did focus on the goals. I think in Raleigh, you had a student that was on the upper end of the spectrum. And then in Andrew F, you had a student who was autistic. It was on the lower end of the spectrum. And here, you have another student who is also functioning at a fairly low level. Another student who, like Andrew F, was in the district program for four years. The parents, after four years, feeling that the progress was not adequate, left. The question, I think here, you have a difference because the standard used by the IHO was not, in this case, barely more than trivial. I think that the IHO and the court, and that this court, has not used the Tenth Circuit standard of, you know, trivial events, de minimis. Slightly above de minimis. And I think that the decisions that I've been involved with in federal court and hearing officers and the SRO, I think that universally, I don't know that it rises quite to where Andrew F, but it was certainly above where the Tenth Circuit had put it in Luke P and Andrew F. One interesting factor here is it appears that this child in the public system was proceeding from grade to grade. Although I understand it unquestionably would be adapted. But it looks like at the prospect school, the progress was, if anything, less. Uh, no. The fact that the student was going from grade to grade, he was in the same, he was in a class with 12 students, and they were just calling him the following year. I mean, so I don't think that you can say he was progressing from grade to grade. It's, you know, he was in the 12 student class in kindergarten, then he was in the 12 student class in first grade and second grade and then third grade. You think it was sort of grade inflation there? Well, I mean. We see that even with students that are not handicapped. They get bumped up to the next grade when they haven't achieved the standards for the previous grade. I mean, I think one of the things that parents in the district agree is that this is a student who is in alternate assessment. And so the question of moving from second to third grade isn't, did he meet the second grade standards and move? The question is, and whether you call it, you know, under the old standard progress. One to one class or program existing on a parallel track in this school system. The school district has the opportunity, the way that it works is that there's something called BOCES, and I forget whether it's an acronym, and it's an intradistrict program where the districts who, like if this district has a 12-1-2, this district might have an 8-1-1, this district might have, and so they would have different programs. Right. It's a pool. And so the district could. They travel, but they get the appropriate education if it is appropriate. Yes. And that's explicitly on one or more of the IEPs that the parents requested that the student be placed in one of these BOCES programs. So there was the eight to one to one alternative? Yes. Within BOCES, it wasn't developed in the record, but it was something that parents asked the district to consider, and then the district refused to consider that. And that is part of the predetermination claim, that the district on the IEP failed to consider anything. They offered the same 12-student class nine times in seven years. And then there is the letter, I'm sorry, the email by Ms. Hayes to the parent where she talks about the continuation, that's essay 49, to talk about the continuation of the class. And so our position is that 8-1-1 was available through BOCES or something smaller and different, more appropriate, where the child could get the appropriate one-to-one intervention in reading. Why should we deny the SRO the superior deference that we are enjoined to give that officer? I mean, this court in MH held that the SRO gets the initial deference, but then when it's not, when it doesn't merit it. Why shouldn't we give that deference? And Judge Karas addressed that in, I mean, he went through the SRO in eight pages. What's the strongest reason? The failure to grapple with the great evidence about the distractibility and the students' inability to attend.  Some of the district argument kind of contradicts, because the district says, oh, well, he was able to attend in this, but then he had trouble in one-to-one. I mean, the attention... If you have evidence on one side, then you have evidence on the other side. The IHO says one thing, that's entitled to some deference. The SRO says something else on the same record, and we're supposed to give more deference to the SRO? Well, it's not. I mean, I know there's evidence on both sides. I have read this. When the SRO grapples with the evidence, then the SRO is entitled to deference. When the SRO fails to grapple with the, particularly the most critical evidence, then the SRO is not entitled to deference. And in this case, the IHO directly went at that evidence, and the SRO did not. So, I mean, you're talking about whether the class size was adequate or not. Yes. You just kind of concluded that it was, but didn't really grapple with the evidence that dealt with that question. Particularly the report from Dr. Dorda. I mean, Dr. Dorda looked at the child when he was in the district program and found that due to the distractibility, he was not making what would be adequate progress and needed a smaller class and needed one-to-one intervention. The district tries to kind of separate out 811 and one-to-one or one-to-three intervention. But that, I mean, it was a package. And the district doesn't address the fact, well, there is no one-to-one intervention in the IEP. And so, I mean, the district says, well, look, 811 is 814. There was a mistake. Well, but except that the one-to-one intervention that was critical to the student's ability to read, and as you noted, the reading is a critical, critical skill, that was missing from the IEP, the IEPs. Okay. Okay. Thank you. We'll hear from him. Just very briefly, with regard to Dr. Dorda's report, one thing to mention, I know the court has it, but he starts out by saying not only his first conclusion, but his foremost conclusion is that the district's current placement is fully supported by the data with regard to the student's cognitive and behavioral needs. So in one sense, he was endorsing what the district was doing. It's actually described not, again, it's his first and his foremost conclusion. The second thing is that it wasn't only Dr. Dorda that the IHO relied upon. It was Dr. Stern. And what's never grappled with by the district court or the IHO is that Dr. Stern's testimony was retrospective. She never suggested a particular class size at the CSE meeting. Her report doesn't mention particular class size. In fact, she has- That's different. We've talked about retrospective evidence, but that's usually in connection with the IEP, that the school district can't come in when something isn't in the IEP and say, well, we would have done this anyway. We would have improved the situation above the IEP. That's the context in which the retrospectivity comes up, and that's not really what's- And what I would submit, Judge, and I know that's your opinion in the RE against New York City case from 2012, but there are other cases that specifically say that that applies for both sides, that the district can only be charged with knowledge that exists as of the time when the CSE meeting is conducted when you recommend the placement. And again, the SRO did grapple with this and said at the time of the CSE meeting- Are there a couple of Dr. Stern interventions here at different times? There were two reports. Two reports. In neither of them does she suggest a particular class size. In fact, she has 17 recommendations, only one of which deals with attention and not in the context of class size. Dr. Daugherty's recommendations don't deal with attention in the context of class size. So again, we feel that that's retrospective evidence. And again, the SRO pointed out that both Dr. Daugherty's and Dr. Stern's recommendations were somewhat attenuated in time. At the time the CSE was making its recommendations on June 14, 2012, two and a half years old then, and on May 31, 2013, over three years old at that point. I think that's an appropriate decision for the SRO to make to give her educational deference. As this court pointed out in Hardison in 2014, deference to an expert involves not only giving the expert the freedom to decide whether conclusions are supported by facts, but also how much evidence is necessary for the expert to reach that conclusion. And I submit that this is a case of exactly that. There's certainly sufficient discussion in the record. There's objective evidence within the meaning of Frank G. and the Second Circuit's other cases to support this finding by the SRO, which we believe is supportable. We see no mistakes in it. And choosing which pieces of evidence to select and give emphasis to, we respectfully submit is not the province of the district court and should not be countenanced by the CSE board. Thank you. We'll reserve decision. Thank you.